STATE EX REL. KEANE, APPELLANT, *v.* BOARD OF COUNTY COMMISSIONERS ET AL., RESPONDENTS.

(No. 6,351.)

(Submitted December 5, 1928. Decided January 4, 1929.)

[273 Pac. 290.]

542

*Messrs. Guinn & Maddox,* for Appellant, submitted a brief; *Mr. C. C. Guinn* argued the cause orally.

*Mr. D. L. Egnew,* for Respondent, submitted a brief and argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Appeal by the state of Montana on relation of James Keane from a judgment dismissing a proceeding to review the action of the board of county commissioners of Big Horn county in creating a herd district.

On April 4, 1927, a petition for the creation of a herd district, as therein described, was filed with the county clerk of Big Horn county and was thereupon presented to the board of county commissioners of that county. The board forthwith authorized its clerk to "publish a notice of hearing as provided by law." Pursuant to the direction of the board the clerk caused to be published, in the matter and for the period prescribed by statute, a notice which closes with the statement that "the board of county commissioners have set as a date of hearing on said petition Wednesday, May 4th, 1927, at 2 o'clock p. m., at which time said petitioners will be heard."

Pursuant to the notice a hearing was had and thereat the petitioners appeared personally and by counsel, and twelve land owners within the proposed district appeared in person, by counsel and by written objections and protested the creation of the district, James Keane being one of the protestants. The written protest states seven grounds on which protestants assert the district should not be created and apparently charges, in general terms, that the petitioners failed to meet each and all of the requirements of the statute respecting such a petition, and among these charges it is asserted (5) that "notice of the creation of said proposed district has not been given according to law."

No record is presented containing the proceedings had on the hearing, other than the minutes and orders of the board from which it appears that the hearing was adjourned for the purpose of verifying signatures and checking the lands included in the proposed district. Being, finally, fully satisfied

with the petition, the board, on June 7, 1927, made special findings in support thereof as to each of the requirements of the statute; finding No. 6 being "that the description, notice and the petition for the district substantially comply with the law." On these findings the board made and entered its order creating the district, and thereafter relator applied to the district court for a writ of review, in which application he made the same charges as were contained in the protest filed by him and his eleven associates against the creation of the district. A writ was issued and return thereto made of the proceedings of the board and a hearing had thereon, at which no testimony was taken. On the record the court dismissed the writ and the proceeding; judgment was entered accordingly and from this judgment this appeal was taken.

Counsel for relator assert that the notice given was but notice to the petitioners that the petition would be considered and not a notice that the board would on the day set hear protests and verify the signature, as required by the statute, and that the proposed district was not at least three miles in width, outside of the area covered by incorporated cities, in contravention of the statute, and, on these assertions predicate error upon the dismissal and entry of judgment.

On certiorari the only questions for determination by the district court were as to whether or not, on the record presented, the board of commissioners was shown to have acquired jurisdiction to proceed to a hearing on the petition and, if that body had acquired jurisdiction, it exceeded its jurisdiction in making the order creating the district, as certiorari lies only to determine such question. (*State ex rel. Board* v. *Jackson*, 58 Mont. 90, 190 Pac. 295; *State ex rel. Pereira* v. *District Court, ante*, p. 349, 272 Pac. 242.)

1. Section 3384, Revised Codes of 1921, provides that "herd districts may be created * * * to contain fifty-four square miles or more, lying not less than three miles in width, outside of incorporated cities, upon petition of the owners or

possessors of fifty-five per cent. of the land in such district, and providing twenty-five per cent. or more of the land in such district is in actual cultivation, * * * upon presentation and filing such petition, properly signed, giving outside boundaries and description, * * * the county commissioners * * * shall set a date for hearing protests and verifying signatures and shall give not less than twenty days' notice of the same by three publications in a newspaper, * * * and should it appear to such county commissioners after such hearing that the signatures are genuine, they shall immediately declare such herd district created. * * * should the signature of lessee appear * * * the owner * * * may * * * enter protest,'' etc.

There can be no question but that the notice required by this statute is jurisdictional or that the rule applicable to all similar notices, to the effect that substantial compliance with the requirements of the statute is indispensable to action by the tribunal named (*State ex rel. Stevens* v. *McLeish*, 59 Mont. 527, 198 Pac. 357; *Scilley* v. *Red Lodge etc. Irr. Dist.*, *ante*, p. 282, 272 Pac. 543), is applicable here. (*State* v. *Catlin*, 33 Idaho, 437, 195 Pac. 628.)

The object of the required notice is to notify, not only the petitioners, but land owners within the proposed district other than those who have signed the petition, that on a day certain the board will meet for the purpose of verifying the signatures and hearing objections thereto and determining generally the sufficiency of the petition. If in such a notice there is any ambiguity rendering its meaning doubtful, the doubt must be resolved against the party giving it (29 Cyc. 1124), and if the wording of the notice is such as to be misleading to those entitled to notice, it is fatally defective (*Ahern* v. *Board*, 39 Colo. 409, 89 Pac. 963); but when a notice, although informal, gives the necessary information to the proper parties and is not misleading, its sufficiency will be upheld. (*People* v. *Lee*, 72 Colo. 598, 213 Pac. 583.)

Applying these rules to the notice before us, it would seem ▮▮▮ that the information contained therein that on a day certain a hearing would be had before the board ''on the petition'' should be sufficient to advise any reasonable person desiring to protest, that such date was the time for him to appear and enter his protest and that this notice cannot be said to be misleading to those entitled to notice. However this may be, this relator and his co-objectors were not misled; they appeared and protested personally and by counsel; they had their day in court as effectively as though a notice against which no technical objection could be lodged had been published; they did not appear specially for the purpose of challenging the sufficiency of the notice, but generally to challenge the sufficiency of the petition, and only mentioned the charge of the insufficiency of the notice as one of seven grounds commanding adverse action by the board.

''Publication of the notice may be likened to constructive service of process in a judicial or quasi-judicial proceeding without which the tribunal has no authority to proceed at all'' (*Drainage District* v. *Bernards,* 89 Or. 531, 174 Pac. 1167), but in such judicial proceeding appearance by answer to the merits waives any defect in service of process, and here, as in a proceeding to establish an irrigation district, the filing of objections to the petition constitutes an appearance, an answer, to the merits. (*In re Fort Shaw Irr. Dist.,* 81 Mont. 170, 261 Pac. 962.)

Following up the analogy of constructive service of process, we are of opinion that if relator desired to challenge the jurisdiction of the board on the ground that no valid notice was published, he was required to restrict his protest to that ground alone ''and keep out of court for all other purposes.'' (*Gravelin* v. *Porier,* 77 Mont. 260, 250 Pac. 823.)

Having appeared generally and contested the creation of the district on the merits, relator waived his objection to the notice and the district court was justified in holding that, as to relator, the notice was sufficient; therefore the board ac-

quired jurisdiction over the person of relator and over his lands for the purpose of including them within the district if, in fact, the petition was sufficient to warrant the creation of the district.

2. The sufficiency of the petition to vest the board with jurisdiction to create the district is challenged upon the sole ground that two measurements may be made across the district which will show less than three miles between its sides.

We have been furnished with a map of Big Horn county on ██ ██ which are traced the boundaries of the district, which map was introduced in evidence on the hearing before the district court and it is stipulated herein that it may be used here. This map shows that the district is approximately twenty miles in length, extending north and south and practically parallel to the Big Horn River, which is made its eastern boundary; all other boundaries follow section lines. Beginning where a section line intersects the west bank of the river, the boundary line runs due west three and one-half miles, thence south two miles, thence west two miles, thence south one mile, thence west two miles, thence south thirteen miles and so on until it again intersects the river bank on section lines.

(a) About a third of a mile below the section line extending east to the river from the first right angle made in the western boundary line as above described, the river makes almost an "oxbow" bend to the west of approximately two miles, so that a line drawn from the angle mentioned to the river bank at the peak of the curve would be about one and one-half miles in length. This fact, counsel for relator contend, renders the district less than three miles in width, in contravention of the statute.

In order to secure a measurement of less than three miles between the sides of the district, however, the lines must be laid at an angle of approximately twenty degrees from the section line and at an angle to the line of length of the district, as the section lines from the angle mentioned to

the river and from the bend to the western boundary are more than three miles in length.

Whether or not the condition which we have attempted to describe destroys the integrity of the district and thus renders the action of the board of commissioners in excess of jurisdiction, depends upon the construction to be given to the phrase "lying not less than three miles in width," and particularly upon the meaning of the word "width" as used in the statute.

Words and phrases as used in our Codes are to be construed according to the context and the approved usage of the language, unless clearly used in a technical sense (sec. 15, Rev. Codes 1921), and where a term used in a statute is not of a technical nature nor one which has acquired a peculiar meaning in law, and is not defined in the Codes, it must be understood in its ordinary sense and with the meaning commonly attributed to it. (*Northern Pac. Ry. Co.* v. *Sanders County*, 66 Mont. 608, 214 Pac. 596.)

The three dimensions recognized in the sciences are length, breadth or width, and thickness, and every surface must have the first two of these dimensions. (*Albert Lorsch & Co.* v. *United States*, 146 Fed. 379, 76 C. C. A. 651.)

"Width" is defined by Webster as "extent from side to side; breadth; wideness; as a width of cloth, of a door." This is the meaning commonly attributed to width; the idea of breadth throughout the entire length. When your surface or plane is in the form of a parallelogram, such as a legal subdivision of land or a geometrical plane conceived by projecting a straight line of a given length a certain distance through space, the application of the definition is simple; but when your given figure, as here, is bounded by irregular lines, the most that can be said as to its width, in this sense, is that it has a "mean width," which is the unit used by surveyors in determining areas and the problem before us is one of surveying rather than of law.

The usual subdivisions of lands are in the form of squares or rectangles, width being measured at right angles to the length, "but where a tract of land is described as bordering on or fronting a certain distance on a stream, in the absence of other controlling factors, such distance must be measured in a straight line between the extremities of the opposite boundaries" (Johnson on Theory and Practice of Surveying, p. 232), and, in determining the area of such a tract "it is customary to run straight lines as near the boundary as practicable and then to take rectangular offsets at selected intervals from these bordering-lines to the irregular boundary. These small areas are then computed as trapezoids, the distance along the base line being the altitude and the half-sum of the adjacent offsets being the mean width." (Id., p. 216.) Drawings showing the methods of computing such areas appear in this work, showing the base line drawn as nearly parallel to the bank of the stream as possible and the parallel lines from which the mean width is to be figured, extended from this base line at right angles thereto; thus all measurements of width are made at right angles to the length of the tract.

Again it is said by Johnson (p. 213) that "in extending side boundaries beyond the meandered lines to the river bank or lake shore, such extensions beyond the meandered lines should run *at right angles to the shore*. This rule also applies to city lots and to all lands fronting on bodies of water."

Getting back to the common and usually accepted definitions throwing light upon the use of the term "width" we find that "wide," from which comes "width," is defined as "of a specified measure in a direction at right angles to that of length," and this method of measuring width is directed in the definition of "breadth," which is synonymous with width; thus "breadth is the distance from side to side of any surface or thing; measure across or at right angles to length; width." (Webster's New International Dictionary.)

Applying the method of measurement directed to the survey of lands and, generally, for determining width of any surface or thing, all parallel lines projected at right angles to the base line or the length of the district under consideration, or from the river bank to the opposite side, are found to be more than three miles in length and thus all measurements of width, as well as the mean width of the district, conform to the requirements of the district. Under the above definitions, a single measurement made at an acute angle to the multiple parallel lines, would not give the "width" of the district.

Here, the petitioners, in running the boundary lines of the proposed district, manifestly followed the directions given to surveyors, above, and, in extending parallel lines at right angles to the river bank and along section and subdivisional lines to meet a base line approximately paralleling the river bank and thus form a district at least three miles in width, provided for an offset on the section line before reaching a point opposite the big bend in the river bank, thus compensating for that bend.

We realize that, in creating a district along an extremely crooked stream, the strict application of this rule might lead to absurdities sufficient to warrant a conclusion that the petitioners did not, in good faith, attempt to comply with the spirit as well as the letter of the law, but here we have no such condition as was shown in the attempted withdrawal of a "block of land" from a proposed new county, considered in State ex rel. Woodward v. Moulton, 57 Mont. 414, 189 Pac. 59; but there is evidence, rather, of an honest intent, in good faith, to comply with the requirements of section 3384, above.

To adopt relator's theory that the statute requires that, in measuring width, no point on one side of the district may be less than three miles from any point on the other side, would require—instead of projecting parallel lines at right angles to the base line or to the river bank—the swinging

of a circle, with a radius of three miles, from every bend in the river and carrying the western boundary outside these multiple circles; applying this method to the laying out of public roads, which the statute requires to be sixty feet in width, unless the county commissioners order a greater or lesser width (sec. 1615, Rev. Codes 1921), would require such a board either to order a greater width in every road at all right angle turns or swing a circle from the inner angle and, on securing right of way, leave a worthless piece of land still in the name of the grantor, between the circumference to the circle and the corner of the section or subdivision along the line of which the road is constructed.

After careful consideration, we are convinced that, as to the objection under consideration, there was such a substantial compliance with the requirements of the statute as to render the petition sufficient.

(b) Counsel contend that, measuring across the district through Hardin, the county seat, and eliminating one mile as the width of the municipal limits, the district there is but two and three-fourths miles in width and therefore violates the statutory requirement that such a district shall be at least three miles in width "outside of incorporated cities."

Whatever effect is to be given to the last quoted phrase, we are met with this situation: nowhere in the record before us is there any intimation that any incorporated city is included within the boundaries of the district, nor that Hardin is so located. In fact, outside of the map above mentioned, nowhere in the record does the name "Hardin" appear. The map is traced upon an official map of Big Horn county and thereon, in the fourth tier of sections above the southern boundary there appears a section blocked off and divided into small squares with the word "Hardin" above it. The legend of this map shows that areas so divided into small squares represent "Towns."

We may take judicial notice that Hardin is the county seat of Big Horn county and we are advised by the map that Hardin is a town and lies within the boundaries of the district, but these meager facts thus established do not warrant the destruction of the district on the theory—not established—that Hardin is an "incorporated city."

Provision is made in the Codes for the establishment of incorporated cities and towns; cities fall in three classes, the lowest of which must have a population of not less than 1,000, while all incorporated municipalities having a population of less than 1,000 are designated as "towns," in contradistinction to "cities." (Secs. 4959–4961, Rev. Codes 1921.) There is no requirement that a county seat shall be an incorporated city; it may be a "town or place" (sec. 4386, Id.). Thus we have only the information that the town of Hardin is within the district; whether that town is incorporated or unincorporated we are not advised, while the phrase under consideration refers only to "incorporated cities" which are made distinct entities, distinguished from "towns."

We are not, therefore, in a position to say whether or not the situation here called to our attention would render the petition under consideration insufficient.

For the reasons stated the judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MYERS and GALEN concur.